There are many reversible errors raised in this consolidated appeal. Constitutional errors, evidentiary errors, jury instructional errors, and sentencing errors. So unless the court directs me otherwise, though, I'd like to focus in on two errors today. First, the due process violation for the government failing to disclose material Brady evidence. And second, the government's failure to overcome the presumption of prejudice for allowing its summary witness to observe the trial and tailor his testimony to those of other witnesses. First, as to the Brady issues in this case, the district court erred in denying outstanding Brady, the outstanding Brady issues at the end of trial as quote moot. The issues were raised throughout pretrial motions as well as during trial. Well, it seems to me that part of your Brady issue is that your interpretation of Brady would require the prosecution to obtain evidence not in its possession that was equally accessible to the defense. Can you explain to me why would expanding the reach of Brady in this way be reasonable? Yes, Your Honor, and I would disagree that we are asking for the expanded rule. It's government that's asking for a different rule in a large fraud case with international and multi-agency reach. This court's Brady law already establishes that possession does not mean literal physical possession. Possession as stated in the Stever case, which is quoted in the second opening brief and the reply brief, says that possession for Brady purposes is knowledge and access to, knowledge of, access to. So it's not literal physical possession, and that takes me to an important point, an error in the district court's decisions underlying to the extent the district court ruled on the Brady issues, which was not many of them. The district court did hold that, indicated at least, that because the documents in Japan yet in the receiver's warehouse were not in the literal physical possession of the government, that the government did not have a Brady duty over those documents. Would you agree that you have to show at least constructive possession? Yes. So what's your best evidence in the record pertaining to the possession of those items? Well, I think I just spoke. So let me explain. I think constructive possession is only an issue in sort of an imputed knowledge case. So most of the cases this court sees about access and knowledge is when, you know, for example, it's something in the FBI's file and the attorney or the prosecution didn't know about it, but this court may nevertheless impute that knowledge and access regardless of literal access and knowledge. We have the sort of the flip of that, where the U.S. government had literal access to and knowledge of all of the documents in Japan, all the documents in the receiver's warehouse, but just chose to only take the documents that they deemed relevant to prove their case. They did not, there's no dispute that the federal government, that the U.S. attorney's office and its agents went, I don't know if it's the prosecutors, but the agents at least went to and searched through and took what it wanted. And that they also did the same thing in the receiver's warehouse. So for the government to now disdain any sort of, disclaim any sort of possession over the documents, when you apply the actual proper legal standard of knowledge and access to. Could you have gone and looked at those documents? I'm sorry, Your Honor. Could you have gone and looked at those documents? Was there anything preventing you from doing so? So the documents in Japan, no, Fujinaga could not. But the documents in the SEC's receiver's warehouse, yes. Fujinaga was afforded the ability to go look at them. However, it wasn't as the government presents that it was just sort of a warehouse they could dig through. It was actually, some of it was medically protected information. And this was litigated below in the pretrial motions that Fujinaga had to pay for access fees to get certain boxes and then dig through the information. So that brings me to another point of, but Your Honor asked about Fujinaga's access, whether that's sufficient, but it's not because under Milkey, this court's case law, it has to be meaningful access. And that is what we're missing here. It's not just that can dig through and maybe find this exculpatory evidence. Milkey says that the government has a duty to disclose it. And in this type of paper case, it is not sufficient or meaningful disclosure when the government itself admits that the warehouse documents in Vegas are too voluminous and too numerous for the government to even dig through. And they won't take that obligation willingly or voluntarily. So that in itself demonstrates that there hasn't been meaningful access to Fujinaga, who is the defendant of this case, has no burden of disclosure. And the government had actual knowledge and access to the information. They needed to go look for Brady information from your viewpoint. Yes, Your Honor. In Kyle's, the U.S. Supreme Court says that the government, prosecutors have a duty to learn of exculpatory information. So again, Fujinaga has just put forth the very basic and undisputed Brady principles in this case. It might be that in fact, it is harder for the government to discharge the burden in the sense that it will take more time and resources, but that does not mean it's a special rule. That is just the reality of the government bringing an international fraud case where it alleges conduct spanning back to 2000. And the government didn't take that responsibility seriously below. And the district court unfortunately did not resolve the issues necessary for Fujinaga to demonstrate that these are prejudicial errors. I'd like to point out one more important issue of facts that was never resolved by the district court below. As to the second accounting database, which is called the MOS 90, that was the database used by MRI's accountant, bookkeeper, Peter Munoz. There actually is a second and missing accounting database version of that database. The accountant that took over from Munoz, Jean Guffey, she told, she stated that she gave a copy of that, her accounting database to a government agency. She did not remember who, but she remembered that it was compulsory. She had to comply. And that is the record at ER 5371. And that is a statement that Ms. Guffey told the defense, the defense presented it to the district court numerous times. The government responded saying that they didn't have the database. They asked someone at the IRS who said they didn't. They asked someone at the SEC who said that they did not. But the district court never actually resolved that issue, let alone had an evidentiary hearing to see what Ms. Guffey had to say about the matter. And the fact remains that the printouts from that second database were filed as exhibits to the SEC's civil summary judgment motion. That's how the defense found out about the second database. So there remain substantial issues, in fact, circumstantial indirect that show that someone in the government has this database, but did not give it to Fujinaga. And let me explain why that matters. At least one of the printouts that was attached in the SEC's showed a $19 million discrepancy in revenue for these medical accounts receivable. So while the government attempts to minimize that as maybe that doesn't prove actual innocence, that's not the inquiry. The Brady materiality standard is whether it, quote, could have affected the jury's judgment and undermines confidence in the verdict. And because Munoz, who had control of the government's accounting database, was such a crucial witness, but also had credibility and reliability issues at trial, anything to further impeach him, such as showing that the other accountant actually showed more revenue than he did, that would tend to help Fujinaga's case. If the jury discounted Munoz, then this court cannot have confidence that the jury would have convicted, even if there were other evidence they could have relied on. I know that you didn't put on your list to talk about restitution and forfeiture, but I would like to just spend a little bit of time and then you can go back and use the rest of your time. But my question is, what evidence would you bring to the court's attention if we were to agree that it needed to be remanded on restitution and forfeiture? What evidence would you bring to the court's attention? I'm looking at all of this and I'm not advocating for rough justice, but in the amount of loss, your client's like 74 years old and unless his sentence is reversed, he's got a 50-year sentence, right? And they're talking sort of in the billions, but certainly in a lot of the millions. I can't see, maybe $30 million, maybe the SEC has $30 million. Is there any money out there that's ever going to go back to victims? It doesn't look like we got much money, that there's any much of a pot there. And so if the restitution were $813 million or if it were $735 million, it still seems like the victims are going to get zero. So I'm kind of wondering, I'm trying to focus on how does any of this make a difference? And what would we tell the district court? You know, if I'm going to tell a district court you did something wrong, I want to tell them what they should do in order to, and neither of you really propose what the right amount of restitution is. Or the forfeiture, it looks like the district court didn't follow the right procedures. I can see that, but then I'm wondering what difference does it make anyway? Yes, I understand the court's practical concern and I don't know what money can ever be recovered. That is handled in the SEC's case, I think, and there hasn't been a final list of where the money is going to go that was. So how can we fault the district court if the district court doesn't know it? Or there's claims that somehow there should be, that this, what the Suzuki's, you know, that there shouldn't be. But then we don't even, but the district court doesn't have any of that information. So I'm just wondering, if you tell a district court they do some, did something wrong, you have to tell them how to do it right. And I'm having a hard time, what would I tell the district court to do it right that would make any difference? I understand, Your Honor. The actual money that can be attained is not the inquiry, though. The district court failed to comply with Honeycutt for forfeiture. And this court's recent case in 2021, U.S. v. Thompson, which is cited in the reply, explains that the proceeds must be determined by what Fuji Naga ultimately obtained. Well, but there's a lot of evidence that your client is the kingpin here. I'm sorry that, I mean, whether people believe that or not, I know that you would argue otherwise. Your client's not like a college student that's just making a little money on drugs. It's not a Honeycutt situation. It is, Your Honor. It's a Thompson situation, exactly in the Thompson, this case, this court's public decision. It was the leader of the conspiracy where this court still said he could not be liable for the proceeds that were ultimately obtained by the other codependents, regardless of leader status. So Thompson is uniquely on all fours as far as case law goes. It is the exact roadmap that the district court should follow. So what is the right number of restitution? What's the right number? The restitution must at least match actual loss, and the government still has not established a reliable plan convincing actual loss. It at the very least shouldn't include $319 million for liquidation payments because that is not actual loss. This court must look at for both loss and restitution. So is actual loss $2 or what's actual, I mean, you're part of this case. What's actual loss? What's your argument? What's actual loss here? The actual loss is at most $272 million, which is new investor money from 2009 to 2013. That's the opening brief at page 68. That was Fuginaga's number. And if I may, before I cut into my rebuttal time, turn to the summary witness issue. Sure. Your Honor. I still don't know what to tell the district court, and I'm going to ask the U.S. attorney too, but I just don't know. Yes, Your Honor, I would just say yes, to remand for the court to follow U.S. v. Thompson's rules and then in restitution to minus out at least liquidation. Right, but let's assume error for the moment. How does it affect his substantial rights? For which claim, Your Honor? We're talking about forfeiture and restitution. Let's assume error on both of them, that you're correct on that. How does it really affect his substantial rights, given the amounts of money involved? So neither of those claims are planar. They're both preserved. So if the court didn't calculate it correctly and follow this court's rules, then it must be sent back for a recalculation. So how is your client prejudiced, is my question. I mean, let's assume that there's error, but the net result is restitution that he can't pay and there's nothing to forfeit. Why does it matter? That is a matter for the civil collection agency wing of the U.S. attorney's office. That's never informed this court's. No, I'm just asking, I mean, is this a meaningful exercise? What are you going to argue before the district court? Yes, I think it's a meaningful exercise because the district court only has authority to order the actual proceeds be disengorged for forfeiture and only has the authority to order that victims be made whole for restitution. So when the when the forfeiture or restitution exceeds that, the district court has exceeded its authority and the judgment on that part is invalid. And I gather, in answer to Judge Callahan's questions, at this point you have no idea what number you're going to suggest to the district court for either. Is that right? Well, I did. I did note that Fujinaga proposed a 272 million loss below. Also, this is the government's burden. So I understand. I'm just saying you don't have you don't have a number that you can tell us today that you're going to urge the district court on either restitution or forfeiture. No, Your Honor, because the loss amount, the best I can tell you is what's in the record, which is Fujinaga proposed 272 million in loss, which would be actual loss for restitution. And then forfeiture would be only the amount he's obtained, which the government has never attempted to prove. So it's Fujinaga can't guess in the dark as to what the challenge when the government hasn't put forth an effort, a number that actually shows his proceeds. And so if I may quickly turn to the summary witness error, the government hasn't overcome the presumption of prejudice for allowing a summary witness to observe trial. This is exclusion as a right is what was required under Rule 615. He was not essential to the government's ability to present their case. He was helpful to the government proving credibility and bolstering its case. The district court admitted or allowed this witness to to watch the trials because the government wanted to, quote, wanted him to explain any testimony that is not consistent with his charts. That's the exact reason that exclusion exists so that witnesses do not tailor their testimony. That is this court's decision in L, which analyzed the current version of Rule 615, that that is precisely why witnesses should be excluded. And this matters. It prejudiced Fujinaga. Not only is it presumed there are instances in the that Patron, the summary witness, testified that after he saw the defense find a check that was missing from Munoz's records, he went back. I took it to heart, quote, unquote, and went back and looked through my charts to see if there were other issues. That in itself shows to the jury that this witness, it improperly allowed him to look credible, reliable and neutral, tailoring his testimony to the district court. So I may preserve the rest of my time for it, but I'll thank you. Certainly. We'll hear from the government. Thank you, Your Honor. May it please the court, William Johnston, appearing on behalf of the United States. Can you help me out on the forfeiture and the restitution? As far as it, you know, what it's what I'm happy to. It's you know, what's the district court? The district court, if if no one's going to help the district court, if we can't tell the district court what they did wrong and there isn't you know, I'm not advocating rough justice, but I'm just not. No one's telling me what the answer is here. And it should be clear what the answer, you know, what is the restitution? And it doesn't look like the forfeiture was followed here. But what's the difference? I don't know. Yes, Your Honor, the only thing that wasn't followed was the procedures for issuing a restitution order. What the court failed to do was have a preliminary hearing, followed by a final forfeiture order. But the defendant consented to a consolidated sentencing and forfeiture hearing. And so that's why the court didn't have a preliminary hearing. And then there wasn't also a preliminary order of forfeiture. There was just a final forfeiture order. Now, this court has held numerous times, albeit in unpublished opinions, that when the defendant has a meaningful opportunity to contest forfeiture, then the court's failure to have a preliminary hearing versus a final hearing doesn't result in any prejudice. And so that's the only error that ever happened below. The actual restitution and forfeiture numbers are correct, and I can explain them as to why they are correct. The restitution number is correct at $1.12 billion. And the reason why it's correct is that the court started with the fact that $1.56 billion of outstanding certificates existed at the time the scheme collapsed. And what a certificate meant, it was actual principle. It was not interest. It was the amount that the defendant owed to individual investors. Now, the reason why the court just didn't adopt $1.56 billion was that there was a possibility that some amount of that number represented accrued and recapitalized interest. And let me explain where that could have happened. One of the scenarios was somebody, instead of receiving their interest payments on a yearly basis, could defer receiving it, recapitalize it, and then at the maturity of the certificate, reinvest the entire amount back in a new certificate. So that would show that the outstanding certificate amount would increase without any new cash coming in. So what the court followed was the actual cash. And there were two principal places that the reliable cash calculation came from. One was the calculation by Peter Munoz in the MAS 90 data. He testified in their citation in our brief as to this exact number. It's $813 million. It's a sum of approximately $750 million that was misappropriated from the original Class A and Select A accounts, and then the holding account number, which was approximately $70 million. So those two numbers showed that there was $813 million of cash that had been misappropriated. And Peter Munoz testified... In one sense, those were the ill-gotten gains. And is that equivalent in your view to loss? Yes. Explain that. So there is a difference in this case between loss and forfeiture, but that's only as to what the district court found. That wasn't essential. The court could have found that it was $1.129 billion. It's just that the court didn't need to maximize the loss amount once the record showed, for purposes of sentencing, that it was more than $550 million. But the charge of the Mandatory Victim Restitution Act is to amount that is supported by the evidence. And the reason why that the court added this extra $319 million at the government's urging, this was not error, because the liquidation payment isn't capturing money that went back to investors that made certain investors whole. Because think about it the way a Ponzi scheme works, is that every new dollar that comes in, if it goes out to somebody else, it's because you have a new victim. So the $319 million calculation compensated some victims, but at the expense of creating new victims. And so that's why the court was correct in adding the $319 million to the $813 million that was in the database. So that's how the court came to a reliable estimate, which is the only thing that the MVRA requires, a reliable estimate of the amount of victim loss. And that was $1.129 billion. That's not a dollar more than the defendant stole through his scheme. And so the way the court got to the correct number for each victim, was it took the entire list of victims who held outstanding certificates, and then did a pro rata reduction of the $1.56 billion, so that the entire amount owed would be no more than $1.129 billion, which was the amount established in the record that was actually stolen by the defendant in cash. So it did not So is it your position that the restitution order need not offset the amount of money paid back to investors, either by the receiver or in a parallel civil proceeding? Well, no, we actually agreed that it does need to be offset by the amount that the receiver obtains and distributes, but the receivership hasn't been terminated yet. And so until the to reduce it by, because, and this is a clear in the, in the, there's a second circuit case that Elvis that you can't reduce money until they can't reduce an outstanding restitution order until monies have been paid as part of another proceeding. And that hasn't happened yet. And partly the reason why it hasn't happened is because the defendant has engaged in trying to destroy as part of winding down his conduct. How much money has been secured at this point? Approximately $30 million. Okay, that's what I thought. So does this court's recent decision in the United States v. Thompson, which the district court didn't have the advantage of, necessitate remand on the forfeiture orders so that the district court can determine what share of the proceeds, quote unquote, came to rest with Fujinaga and the Suzuki's? If, does it need to remand for that? No, it doesn't. No, this court does not need to remand based on Thompson. Thompson is distinguishable here. So what the facts of Thompson were an investment fraud scheme, where the various co-conspirators had the money routed through various attorney escrow accounts. And immediately out of the escrow accounts, they were diverted up to the co-conspirators. So these were sort of, you know, think of it like some bank robbers divvying up the loot, even though you might have one person who grabbed the money first, and then at the hideout, they divvied up the cash among themselves. That's not the facts of this case. The facts of this case is that Mr. Fujinaga was the sole person who ran this company and that he had assistants in Japan raising funds. And that they didn't, the Suzuki's didn't even join the scheme until 12 years into its operation in 2012, when Mr. Fujinaga had to be transparent with the Suzuki's that they needed to raise new investor funds to pay off old investors. And that's what's explicit in the facts. So the difference between this case and Thompson case is that the money came into Mr. Fujinaga's possession the moment it was wired to an account in Las Vegas. The Suzuki's had no control over it. At no point did they ever have any type of constructive or actual possession. So when this court was looking at applying the Honeycutt position, the Honeycutt rule, which says limit the amount of forfeiture to the amount of funds that the defendant actually acquired or obtained, it relied on the evidence in the record that Mr. Fujinaga possessed and controlled exclusively the money when it arrived in Las Vegas. And so in that sense, it would be consistent with Thompson because the money came to rest in Mr. Fujinaga's possession. The mere fact that he may spend certain parts of his proceeds to compensate people who helped raise money for him or he buys a car for himself or on any other purpose doesn't violate either Thompson or Honeycutt. What this court had concern about in Thompson was the fact that the forfeiture order was joint in several, not explicitly, but in the sense that one defendant was ordered to forfeit the entirety of the scheme's proceeds, $2 million, which was the amount, the total proceeds. And then another co-defendant was ordered to forfeit $600,000. So basically the government had the right to forfeit more than the total number of funds that had even been obtained in the scheme. Here, the court ensured that that would happen by ensuring that the government would have no right to collect in forfeiture any more than $1.12 billion, which is the same as the restitution amount. It's the same amount of money that was misappropriated. So here this court has complied with Honeycutt because it hasn't ordered the forfeiture of funds that are not tainted. The only funds are the ones that have been ordered forfeited or the ones that were tainted and they were in Mr. Fujinaga's possession. Do you want to turn to the Brady issues? Yes, I'll move to the Brady issues. So this court doesn't have to rule on prong one or prong two of the Brady analysis because you can dispose of all three claims on the materiality prong. And that's because the posture of this case is very different than most Brady cases. Most Brady claims come to your attention when a piece of evidence is revealed in the middle of trial and then it becomes a question of what did the government have, when did they have it, and did it matter? Here the defense can't point to a single shred of evidence anywhere that would undermine this court's confidence in the verdict below. When they talk about the Japanese materials they just say 550 boxes. We're not sure what's in those 550 boxes, but they must be helpful to us. We hope it is, but again that's pure speculation. This court has rejected that type of speculation time and time again that the defense has to do more than speculate that there are helpful materials in far-flung places as opposed to actually articulating exactly what it was that they and exhibits from the Argonne database introduced in trial. And there was the actual person who testified at trial, Mary Luszczak, who was the custodian of the Argonne database. And she testified that the amount of receivables that MRI collected was a small fraction of the number necessary for this company to not have been a Ponzi scheme. So they can't point to contradicted what Mary Luszczak testified about. Again, just speculation. With respect to the MAS 90 database, again, they speculate that this second database would be helpful to proving that MRI wasn't a Ponzi scheme. But the bank records were undisputed at trial that this was a Ponzi scheme. The defendant's own expert said this was quote classic Ponzi scheme activity. All they can point to is a $19 million revenue entry, which is meaningless in light of the testimony from the government summary witness where they would have needed been earning $800 million a year in order for this not to have been a Ponzi scheme. So $19 million when what you need would have needed was $800 million, it simply doesn't get you anything. And that's before we this court even looks at the explicit faxes between Mr. Fujinaga and the Suzuki's where he's telling them, please raise new money so we can pay back old investors. So this court doesn't even need to go and address the other two ones. But if it is inclined to address the other prongs, the government's position is squarely supported by the case law. And in this, the most recent articulation of the government's principle of the discovery obligations in the Kano case says the government's obligations extend to materials that they have knowledge of or possession of in the hands of an agency that either participated in the investigation or another federal agency. All of the entities that they point to are one, the government of Japan, no court or no panel of this court has ever held that the government's discovery obligations extend to the government of a foreign government. The other entity they talk about is the receiver. The receiver is an agent of the judicial branch, not the executive branch. So also outside the scope of the government's discovery obligations. And then the final fancy math tiny database. Well, we don't even know one knows and it's not in the record who possesses it. So they can't speculate that this isn't you know, that they have to rely on pure speculation that it's in the hands of any entity that is connected to the federal government or to the agency that investigated the defendant here. We didn't brief this in our brief, in our answering brief, but the court, if it's inclined to look more into this and look at the government's response at ER 5432, which sort of lays out the efforts the government took to ensure that none of the entities that participated in its investigation had the second mass 90 database that included the FTC, included the FBI, included the IRS. So even though it's the burden for the defense to prove that is the government that possessed it, the record below established that the government did not possess it. So with respect to possession, the record shows that the defense had the equal and same opportunity as the government to explore the receiver's materials. In fact, they located the very Argonne database that they said the government has suppressed in the receiver's unit a year before trial, and didn't make any efforts to examine it, to try to recover the materials. Instead, a month before trial, tried to get the indictment dismissed by claiming that the government somehow had suppressed it when they had known about it in the receiver's possession for over a year. So the record below undercuts any claim that the government either possessed this or suppressed it, or in any event, would have been material to the defense. With respect to the Japanese materials, while it is true that the defense doesn't have an MLAT authority, they do have the power of letters robatory, which is a process by which a criminal defendant can petition a court to send a request to a foreign court to request foreign evidence. The defense never did that here. In fact, they never even requested the 550 boxes until this appeal. The only document from Japan that the defense ever requested was a supposed interview report by a SESC, so the Japanese securities regulator, one of their employees that had participated in some and the government contacted the SEC and said, hey, does the SEC have these notes? They said no. And then when we inquired with the office of international affairs, whether these notes could be obtained voluntarily from Japan, they said no. So the district court correctly found that the government made a good faith effort to obtain the very documents that the defense requested. Finally address the summary witness issue. The court appropriately exercised its discretion in finding that the summary witness testimony about the mount of Mars, the medical counts receivable, that that calculation was essential to the government's case. And even if the court should not have done that, the defense cannot show prejudice. In fact, the government can show it was not harmful. So if unless there are any other questions, my time is up. Thank you, counsel. We'll hear rebuttal. Thank you, your honor. Two quick points on rebuttal. First, as to the Brady issue, the government's arguments show that at the least a limited remand for further fact finding is required on the Brady claim, such as what happened in the case, which the government actually relies on at page 27, that the second answering brief this court remanded in that case for the court to properly apply the Brady standards to the court about when the district court got one aspect of the test on this court remanded to the court to make the proper findings. And here, specifically, what the court must make a finding on is who has the math database. The government claims it doesn't, and it does detail it in the record site that it gave to you. However, on the other side of the factual dispute is the record at page ER 5371, where Ms. Guffey said that she did give it to a government agency. And of course, there are a finite number of agencies that would be interested in this information. So at the very least, the court needs to resolve that issue. It was not resolved below, and it remains outstanding. Finally, quickly, Fujinaga did request documents in Japan that are exculpatory and under Rule 16. That's the record at 5855, a pretrial motion to compel that included reports. And also, there's a footnote saying, and of course, this would include anything Brady and Rule 16 that's in Japan. So thank you very much, and for these reasons, we'd ask you to leave now. Thank you both for your arguments this morning. We know there are a lot of issues in the case, and thanks for focusing on some of the key ones. But we've read the briefs on all the issues, and we understand time did not permit you to discuss it, but you're not prejudiced either of you by that. So thank you very much for your arguments. The case just heard will be assessed in the morning.
judges: Siler, THOMAS, CALLAHAN